UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-13490-RWZ

JUNE STEARNS AND CLIFFORD OLIVER,
as Co-Executors of the Estate of WAYNE OLIVER

v.

METROPOLITAN LIFE INSURANCE CO., *et al.*

MEMORANDUM OF DECISION

March 30, 2018

ZOBEL, S.D.J.

Plaintiffs bring this wrongful death case on behalf of the estate of decedent Wayne Oliver, who died in 2016 of mesothelioma after exposure to asbestos during construction of two power plants, Pilgrim Nuclear Power Station and Calvert Cliffs Nuclear Power Plant, between 1971 and 1978.[1] Defendant NSTAR Electric, formerly Boston Edison Company ("BECO"), owned Pilgrim Station during the relevant time period. Oliver was an employee of non-party Bechtel Corp., which acted as BECO's architect-engineer with responsibility for construction at both plants. Defendant General Electric Company ("GE") designed, manufactured, and sold steam turbine generators for installation at both plants and its engineers supervised each installation. Other than the insulated turbine-generators and nuclear steam systems supplied by GE, all

---

[1] Oliver alleges additional asbestos exposure during his work at a shipyard from 1967 to 1970, but that period is at issue only as to Section III (A)(2) of the discussion, infra.

construction materials and supplies were specified and procured by Bechtel.  Before the court are GE and NSTAR's motions for summary judgment.  (Docket ## 314, 307).

I.      **Factual Background[2]**

I summarize the relevant facts in the light most favorable to plaintiffs, the nonmoving party.  See Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 172 (1st Cir. 2015).

    A.      **Construction of Pilgrim Station**

Pilgrim Station, as a nuclear power plant, was subject to the ultimate oversight of the United States Atomic Energy Commission ("AEC"), with BECO responsible for obtaining all required permits and approvals.  BECO's onsite inspectors "maintained an overall surveillance of construction activities by means of audit-oriented field inspections in support of quality documentation auditing."  Docket # 307-23, at 14 (Amendment 15 to AEC License Application).  Bechtel and GE, however, directed the engineering and construction and monitored on-site compliance with their designs and specifications.  GE was responsible for Pilgrim Station's nuclear steam supply system, nuclear fuel, and turbine-generator; everything else fell to Bechtel.  Consistent with that division of labor, Bechtel hired and supervised all subcontractors except GE, including subcontractor New England Insulation ("NEI").  NEI was responsible for installing thermal system insulation pursuant to the specifications and direction provided by both Bechtel and GE.

---

[2] The facts are derived from the parties' Statements of Undisputed Facts and responses thereto (Docket ## 353, 358), and all documents filed therewith.

BECO retained authority to conduct inspections at any time and to stop any work it deemed improper.[3]

Absent specific instructions from BECO, Bechtel was to "employ its own standards and . . . perform the work or cause the work to be performed in accordance with its best engineering skill and judgment; provided, however, that all such work shall be subject to [BECO's] review and approval." Docket # 353-4, at 6. Explicitly excepted from Bechtel's engineering authority were "the nuclear steam supply system, nuclear fuel, the turbine-generator and related services already selected by [BECO] to be performed by [GE]." Id., at 5.

Pursuant to its contract with BECO, GE was responsible both for technical direction of installation of Pilgrim's turbine generator and for procuring the turbine's thermal insulation material. GE's specifications called for the use of asbestos-containing insulation materials, and NEI's attempt to persuade GE to use a non-asbestos alternative was unavailing. The extent to which asbestos-containing insulation was used at Pilgrim Station is disputed; BECO contends asbestos products were limited

---

[3] Specifically, the contract between BECO and Bechtel for the construction of Pilgrim Station provides as follows:

> Bechtel shall be an independent contractor in the performance of this Contract and shall have complete charge of the men engaged in the performance of the work. Bechtel shall perform the work in accordance with its own methods, subject to compliance with the specifications, schedules and drawings approved by [BECO] . . .
>
> Bechtel shall take all reasonable precautions to see that its employees and those of its subcontractors during the time they are working at the jobsite comply with [BECO's] personnel and safety regulations in effect, copies of which have been furnished to Bechtel. Owner may require Bechtel to dismiss employees who fail to obey such regulations. Owner's safety and other inspectors will be welcome on the jobsite at all times. The authority of such inspectors will be through [BECO's] organization channels and not directly in the field except for immediate emergencies endangering life or property."

Docket # 353-4, at 25 (Article XIII, "Method and Manner of Performance").

to the plant's drywell containment area, while plaintiff points to evidence suggesting that asbestos was used throughout the facility.

As a pipe inspector at Pilgrim Station, Oliver worked throughout the facility. He was present in both the nuclear reactor building and on the turbine floor when insulation work was being performed. Although he did not personally handle, install, remove, or repair any thermal insulation at Pilgrim Station, he was present while asbestos-containing insulation was cut, mixed, and applied to piping systems and equipment at Pilgrim. Plaintiff and both of his supervisors recalled this process as a dusty one during which employees took no respiratory precautions.

### B. Construction of Calvert Cliffs

As with BECO at Pilgrim Station, GE contracted with Baltimore Gas & Electric at Calvert Cliffs Nuclear Power Plant to supply both the turbine generator and its thermal insulation material. As it had at Pilgrim, at Calvert Cliffs GE included asbestos-containing insulation in its specifications; it also rejected a more expensive proposal providing asbestos-free materials in favor of a cheaper bid.

Oliver's job at Calvert Cliffs involved substantially the same duties he had performed at Pilgrim Station and he was similarly present in the turbine hall during the insulation process. GE representatives were on-site during the turbine work at Calvert Cliffs, and had a satellite office in the turbine room.

### C. Post-Construction Events

Pilgrim Station and Calvert Cliffs opened commercial operations by July 1972 and March 1975 respectively. At least as to Pilgrim Station, however, GE's role

extended well beyond installation to include regular maintenance, inspections, and refueling that continues to the present.

As a Bechtel employee, Oliver was exposed to asbestos insulation during the new construction of Pilgrim Station from approximately May 21, 1971 through July 7, 1972, and of Calvert Cliffs from July 7, 1972 until 1978. He was for much of his life in excellent physical shape, doing daily pushups and pull-up exercises until his diagnosis of malignant mesothelioma on April 20, 2015. He commenced this action on August 25, 2015, and died on July 25, 2016. Plaintiffs filed the operative Third Amended Complaint ("TAC") on February 17, 2017.

## II. Legal Standard

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' for purposes of summary judgment if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' and a 'material fact' is one which 'might affect the outcome of the suit under the governing law.'" Poulis-Minott v. Smith, 388 F.3d 354, 363 (1st Cir. 2004) (quoting Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 (1st Cir. 1993)). In determining whether a genuine issue of material fact exists, "a court must view the evidence 'in the light most favorable to the opposing party.'" Tolan v. Cotton, 134 S.Ct. 1861, 1866 (2014) (per curiam) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).

In the particular context of asbestos litigation, the standard of proof has been somewhat relaxed. See Morin v. Autozone Northeast, Inc., 943 N.E.2d 495, 499 (Mass.

App. Ct. 2011), and cases cited. "Because the resulting injury may not emerge for years or decades after exposure . . . [e]vidence will be sufficient to reach the fact finder if it permits the reasonable inference of the presence at a work site of both the plaintiff and the defendant's asbestos-containing product for an appreciable period of exposure." Id.

### III. Analysis

Defendants move for summary judgment on plaintiffs' various claims associated with their wrongful death action in Count X: negligence and breach of warranty for non-naval exposure (Counts I and II); negligence and breach of warranty for naval exposure (Counts III and IV); gross negligence (Count IX); punitive damages (Count XI); and as to NSTAR only, strict liability (Count VII) and negligence (Count VIII).

As a threshold matter, both defendants invoke the protection of the Massachusetts statute of repose. Mass. Gen. Laws ch. 260, § 2B (hereafter "Section 2B," or "the statute of repose").[4] The statute of repose sets a six-year limit before which any tort action alleging deficiency or neglect in "the design, planning, construction, or general administration of an improvement to real property" must be commenced. Id. The six-year clock begins to run upon substantial completion of the improvement, and unlike an ordinary statute of limitations, cannot be tolled. See Sullivan v. Iantosca, 569

---

[4] The statute provides, in relevant part:

Action of tort for damages arising out of any deficiency or neglect in the design, planning, construction or general administration of an improvement to real property, other than that of a public agency as defined in section thirty-nine A of chapter seven shall be commenced only within three years next after the cause of action accrues; provided, however, that in no event shall such actions be commenced more than six years after the earlier of the dates of: (1) the opening of the improvement to use; or (2) substantial completion of the improvement and the taking of possession for occupancy by the owner." (emphasis added).

Mass. Gen. Laws ch. 260, § 2B.

N.E.2d 822, 823–24 (Mass. 1991); McDonough v. Marr Scaffolding Co., 591 N.E.2d 1079, 1081-82 (Mass. 1992). The discussion below proceeds by defendant, but begins as to both GE and NSTAR/BECO with analysis of the statute's application.

**A.      GE**

**1. Application of the Statute of Repose**

**a. "Improvement to Real Property"**

Plaintiffs argue that the statute of repose does not bar their claim because pre-installation asbestos products are not "improvements to real property" under the law. GE disagrees, contending that the insulated turbine-generators certainly improved each power plant, and indeed were their *raison d'etre.*

Though Section 2B does not define "improvements to real property," the Massachusetts Supreme Judicial Court ("SJC") has read it to mean "a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." Milligan v. Tibbets Engineering Corp., 461 N.E.2d 808, 811 (Mass. 1984) (quoting Webster's Third New Int'l Dictionary at 1138). See St. Louis v. Rockwell Graphic Sys., Inc., 605 N.E.2d 555, 556 (Ill. 1992) ("Relevant criteria for determining what constitutes an 'improvement to real property' include: whether the addition was meant to be permanent or temporary, whether it became an integral component of the overall system, whether the value of the property was increased, and whether the use of the property was enhanced."). Here, the turbine-generators were indisputably permanent additions enhancing the capital value of both power plants, involved the expenditure of labor and money, and facilitated the very

7

function of each plant.  Conceding as much, plaintiffs nonetheless press the point that the pre-installation asbestos-containing insulation materials – as opposed to the completed turbine generators -- do not themselves constitute improvements to real property.  I am unpersuaded by this distinction.  The nature of the activities enumerated in Section 2B – design, planning, and construction -- clearly contemplate the process of improvement as well as the finished product, and thereby reach integral components like asbestos-containing insulation.  See Harder v. AC and S, 179 F.3d 609, 611-12 (8th Cir. 1999) (asbestos-containing insulation materials essential to turbine function are part of the overall improvement).

### b. Application of Statute of Repose to GE's Asbestos-Related Conduct

More vexing is the question whether the statute of repose applies in the context of a contractor like GE's asbestos-related work.[5]  Plaintiffs note that GE knew of the risks and had control of the improvement at the time of injury, and argue that applying Section 2B to inherently latent asbestos claims would bar them completely. Citing its well-documented involvement in "the design, planning, construction, [and] general administration" of each plant's steam supply system, GE insists it is entitled to the repose promised by the law.

The SJC has not considered the application of the statute of repose to asbestos claims.  Its most thorough examination of the statute is in Klein v. Catalano, 437 N.E.2d

---

[5]  Neither party requested that the question be certified, though it presents a state law issue without controlling precedent whose resolution may be determinative.  See S.J.C. Rule 1:03; In re Engage, Inc., 544 F.3d 50, 52–53 (1st Cir. 2008), certified question answered sub nom. Ropes & Gray LLP v. Jalbert, 910 N.E.2d 330 (2009).  Although the issue thus meets the requirements for certification, it remains within my discretion not to certify.  See Boston Gas Co. v. Century Indem. Co., 529 F.3d 8, 13 (1st Cir. 2008) (where SJC has not resolved the question, "our choices are two: we can make our best guess on this de novo review issue, or we can certify the question and ancillary issues to the SJC.  The first path offers the benefit of expedition but with a risk of error; the second path, the reverse.").

514 (Mass. 1982).  The Klein plaintiff was injured when a building's outer door struck him, shattering the door's glass panels.  Id. at 517.  The court held his claims against the building's architect barred by the statute of repose and upheld the constitutionality of the statute.  Id. at 521.  In concluding that the Legislature had struck a reasonable balance between the public's right to a remedy and the need to limit liability, the SJC considered the purpose in protecting actors with no continuing relationship to the site of injury; the proportion of meritorious claims likely to be excluded; and the problem of stale evidence.  All are inapposite here.

First, the public policies animating Klein's analysis of the statute of repose are absent in this case.  In Klein, the court accepted a "well recognized public purpose [in] limiting the duration of liability."  Id. at 520.  "There comes a time," the court continued, "when [a defendant] ought to be secure in his reasonable expectation that the slate has been wiped clean of ancient obligations."  Id. (citation omitted).  In the context of asbestos-related injuries, however, such an expectation ceases to be reasonable.  See Myers v. Crouse-Hinds Div. of Cooper Indus., Inc., 53 N.E.3d 1160, 1167-68 (Ind. 2016) (holding product liability statute of repose inapplicable to asbestos claims).  Unlike the plate-glass window that the Klein architect had no reason to believe would ultimately injure someone, the dangers of asbestos were well-known by 1971.  See, e.g., Docket # 358-26 (Harold Schmeck Jr., A Rare Carcinoma Believed on Rise, N.Y. Times, Oct. 7, 1964).  Despite this knowledge, GE rejected non-asbestos insulation alternatives.

Second, the realities of Oliver's asbestos claim are fundamentally different than the claims contemplated by the Klein court.  In upholding the statute of repose, the SJC noted that – at least in the context of personal injury -- the vast majority of claims would

9

be brought within the six-year period. The Klein court explained, "The Legislature could reasonably have concluded that a period of six years allows sufficient time for the most meritorious claims to accrue." Klein, 437 N.E.2d at 521. In support, the SJC cited the legislative history of analogous statutes of repose showing that 93 percent of all claims against architects are brought within six years of substantial completion of the project, with 99 percent of all claims against architects and builders expected within a twelve-year period. Id. n.13. The same is categorically untrue of asbestos exposure, whose effects will rarely, if ever, appear within the six-year window deemed sufficient for ordinary personal injury claims. See Morin v. Autozone Northeast, Inc., 943 N.E.2d at 499 n.9 ("The latency period for asbestosis-induced mesothelioma is long, with a mean value of 30 to 40 years." (quoting Churg & Green, Pathology of Occupational Lung Disease 350 (2d ed. 1998))); see also Hamilton v. Asbestos Corp., Ltd., 998 P.2d 403, 407 (Cal. 2000) (noting latency periods of 20 years for asbestosis and 30 to 40 years for mesothelioma). The combination of extended latency periods and known risks of exposure make unreasonable an asbestos defendant's expectation of a slate "wiped clean of ancient obligations."

Finally, unlike Klein, staleness of evidence is not as important a factor in a case like Oliver's. In Klein, the court recognized the legislative reasoning that a defendant

> ought not to be called on to resist a claim when evidence has been lost, memories have faded, and witnesses have disappeared . . . Otherwise, those engaged in the design and construction of real property may have to mount a defense when architectural plans may have been discarded, copies of building codes in force at the time of construction may no longer be in existence, persons individually involved in the construction project may be deceased or may not be located.

Id. at 520 (citations omitted).  In asbestos cases, however, the burden of proof has been somewhat relaxed, see, e.g., Morin, 943 N.E.2d at 499-500 – and at any rate plaintiffs here wield strong evidence of both product identification and exposure.  See, e.g., Docket ## 358-4, 358-7, 358-9, 358-14 (exposure); 358-11, 358-13, 358-19, 358-23 (product identification); 358-5, 358-6 (mesothelioma diagnosis and expert report).

Other factors making the statute of repose appropriate in ordinary personal injury cases are distinguishable here.  For example, the SJC noted the perceived injustice in prolonging the liability of actors whose work had been completed many years before.  Klein, 437 N.E.2d at 520 ("An injury could occur many years after the architect or contractor had completed his work.  Since an ordinary statute of limitations did not begin to run until either the date of the injury or its discovery, those involved in construction were subject to possible liability throughout their professional lives and into retirement.").  The Court thus found a rational basis supporting the legislative distinction between protected actors and those not reached by the statute: "owners, tenants, and others in possession or control."  Id. at 524-25.  The defendant architect in Klein performed no additional services with respect to the building after September 1967, and the plaintiff's injury occurred in April 1976.  Id. at 517.  Here, GE had control of the site at the time of Oliver's asbestos exposure, conducted regular on-site maintenance and inspections for at least two decades after construction was complete, and continues to the present to perform refueling outages every eighteen months.  It is thus not entitled to the same repose deemed reasonable for actors whose connection to the instrumentality of injury has long since ceased.

In sum, although designers, engineers, and contractors like GE appear facially covered by the statute of repose, their protection is ultimately determined by reference to underlying acts. Dighton v. Fed. Pac. Elec. Co., 506 N.E.2d 509, 514 (Mass. 1987). As to the acts at issue here, it is not at all clear that the six-year statute of repose was designed to bar a category of claims known uniformly to have a latency period of at least twenty years. To so hold would transform a statute intended to limit liability into one that creates absolute immunity. I decline to do so, and therefore deny GE's Motion for Summary Judgment as to Counts I, II, IX, and X.

### 2. Naval Exposure

Counts III and IV of plaintiffs' TAC allege negligence and breach of warranties for naval exposure arising out of Oliver's work as a pipefitter's apprentice and drafting apprentice aboard Navy vessels at the Fore River Shipyard in Quincy, Massachusetts, from 1967 to 1970. Maritime law governs such claims, see Sisson v. Ruby, 497 U.S. 358, 366-67 (1990), and does not extend liability for component parts not manufactured or distributed by defendants. See Lindstrom v. A-C Prod. Liab. Tr., 424 F.3d 488, 495 (6th Cir. 2005) (manufacturer of marine pumps could not be held liable on seaman's product liability/asbestos claim, absent evidence that manufacturer was responsible for an asbestos-containing product); see also Taylor v. Elliott Turbomachinery Co., Inc., 90 Cal. Rptr. 3d 414, 421 (Cal. Ct. App. 2009) (no duty to warn of the hazards inherent in asbestos-containing products manufactured or supplied by third parties); Simonetta v. Viad Corp., 197 P.3d 127, 129-30 (Wash. 2005) (same). Because there is no allegation that GE ever manufactured or distributed asbestos-containing components, its Motion for Summary Judgment is ALLOWED as to Counts III and IV.

### 3. Punitive Damages

The final count (XI) of plaintiffs' TAC seeks punitive damages. Under the Massachusetts wrongful death statute, Mass. Gen. Laws ch. 229, § 2, punitive damages constitute an element of damages rather than a separate cause of action. See Cox v. Brand 44, LLC, No. 15-cv-11903, 2015 WL 6182469 at *2 (D. Mass. Oct. 21, 2015), and cases cited. Although plaintiffs are free to seek punitive damages in connection with the wrongful death alleged in Count X, punitive damages cannot stand alone as a separate count. Accordingly, GE's Motion for Summary Judgment is ALLOWED as to Count XI, and its Motion to Dismiss the same count (Docket # 283) is consequently DENIED AS MOOT.

### B. NSTAR/BECO

#### 1. Application of the Statute of Repose to Premises Owner

Like GE, NSTAR seeks the protection of the statute of repose. As discussed above, however, the law limits the liability of those engaged in "the design, planning, construction or general administration of an improvement to real property," not that of the owners of such property. See Klein, 437 N.E.2d at 524-25 (the statute of repose "denies . . . protection to materialmen, owners, tenants, and others in possession or control."). BECO emphasizes its planning and administrative roles at Pilgrim Station, but it served in those functions principally with respect to the AEC's regulation of nuclear power, not construction of the asbestos-containing insulated turbines at issue. Although BECO is thus unable to avail itself of the statute of repose, I do not elaborate on this point in light of my determination on other grounds, discussed infra, that BECO is not liable to plaintiffs.

### 2. Product Liability

Counts I and II of plaintiffs' TAC allege that "the defendant corporations" had a duty of reasonable care "in the manufacture, fabricating, testing, inspection, production, marketing, packaging, and sale of their asbestos and asbestos-containing products or equipment," as well as a duty to warn. TAC ¶ ¶ 11-13. As a public utility, BECO never manufactured, supplied, or sold asbestos-containing products. Docket # 353, BECO SMF ¶ 5 ("Bechtel specified and procured all material, equipment and supplies with the exception of the turbine-generator, nuclear fuel and nuclear steam supply system which were designed, supplied and constructed by GE."). Accordingly, NSTAR's Motion for Summary Judgment is ALLOWED as to Counts I and II. See Mathers v. Midland-Ross Corp., 532 N.E.2d 46, 49 (Mass. 1989) (identity of manufacturer, seller, or supplier is element of product liability claim).

### 3. Strict Liability

Plaintiffs also allege that BECO is strictly liable due to abnormally dangerous activity at Pilgrim Station, a BECO-owned premises (TAC Count VII). BECO contends that the installation of asbestos-containing insulation is not an abnormally dangerous activity, both because its risks may be managed with proper precautions, and because any remaining risks are outweighed by the value of energy production to the community.

Massachusetts law of strict liability is consistent with the balancing test set forth in the Restatement (Second) of Torts §§ 519, 520. See Clark-Aiken Co. v. Cromwell-Wright Co., Inc., 323 N.E. 2d 876, 886-87 (Mass. 1975). In determining whether an activity is abnormally dangerous, that test considers the following factors:

> (a) whether the activity involves a high degree of risk of harm to the person, land or chattels of others; (b) whether the gravity of the harm which may

> result from it is likely to be great; (c) whether the risk cannot be eliminated by the exercise of reasonable care; (d) whether the activity is not a matter of common usage; (e) whether the activity is inappropriate to the place where it is carried on; and (f) the value of the activity to the community.

Id., quoting the Restatement (Second) of Torts § 520, Comment f (Tent. Draft No. 12, 164).

As to the first two factors here, the court does not minimize the devastation wrought by mesothelioma. As to the remaining factors, however, I join other courts in concluding that asbestos work is not abnormally dangerous where its risks may be mitigated through the exercise of reasonable care. See, e.g., Tatera v. FMC Corp., 786 N.W. 2d 810, 825-26 (Wis. 2010); PSI Energy, Inc. v. Roberts, 829 N.E.2d 948, 954-55 (Ind. 2005), abrogated on other grounds by Helms v. Carmel High School Vocational Bldg.Trades Corp., 854 N.E.2d 345 (Ind. 2006); see also Bell v. Celotex Corp., 1988 WL 7623 at *2 (Del. Super. Ct. Jan. 19, 1988) (use of asbestos not abnormally dangerous despite court's view that risk could not be eliminated with exercise of reasonable care); cf. Theriault v. Advance Stores Co., Inc., No. 13-cv-4487 (Mass. Super. June 24, 2016) (citing Clark-Aiken in denying plaintiff's motion to amend complaint to add strict liability claim against premises owner). Though its use has now rightly fallen out of favor, asbestos remained very much in common usage at the time of Oliver's exposure. See Docket ## 370-4, 370-5. The balancing tips further in BECO's favor after consideration of the region's severe energy needs at the time Pilgrim Station was built. See Docket # 307-24, at 14-17 (AEC Opp. Lic. Summary at Section 2.3). Accordingly, NSTAR's Motion for Summary Judgment is ALLOWED as to Count VII.

### 4. Negligence

Finally, plaintiffs' claims against NSTAR allege two theories of negligence and gross negligence: vicarious liability for the acts of its contractors, and landowner liability for failure to warn of known dangerous conditions on the premises (Counts VIII, IX, X, and XI). BECO contends it lacked the requisite level of control over the work performed, and further that its common law duty of reasonable care does not extend to an employee of an independent contractor injured as a result of the work the contractor was hired to do.

### a. Vicarious Liability

"In general, an employer of an independent contractor is not liable for harm caused to another by the independent contractor's negligence, unless the employer retained some control over the manner in which the work was done." Lyon v. Morphew, 678 N.E.2d 1306, 1310 and n.11 (Mass. 1997) (citing Restatement (Second) of Torts § 414 (1965) ("Section 414")). Comment c to Section 414 describes the requisite level of control for liability:

> In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress, or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such retention of a right of supervision that the contractor is not entirely free to do the work his own way.

See Corsetti v. Stone Co., 483 N.E.2d 793, 798 (Mass. 1985) (adopting principles of Section 414).

Plaintiffs contend that BECO retained sufficient control to be liable because its safety inspectors were at all times welcome on-site, it could at any time require Bechtel

16

to dismiss employees who failed to comply with BECO's safety regulations, and the contract between BECO and Bechtel for the construction of Pilgrim Station required that Bechtel's work be performed in strict compliance with plans and specifications approved by BECO. See note 3, supra. Under Section 414, however, these allegations create no genuine issue of material fact. BECO's contract with Bechtel provided that Bechtel as independent contractor "shall have complete charge of the men engaged in the performance of the work," employing "its own standards and . . . perform[ing] the work or caus[ing] the work to be performed in accordance with its best engineering skill and judgment." Docket # 353-4, at 6, 25. Bechtel's Lead Pipe Engineer testified that Bechtel controlled the means, methods, manner, and safety of Pilgrim Station construction. Oliver himself testified that Bechtel supervisors directed his work, and no one from BECO ever told him how to do his work. Nor did Oliver recall any BECO employees doing any hands-on work. Thus plaintiff's evidence -- consistent with a general right to inspection and work stoppage -- is not sufficient under the Restatement and Massachusetts law to give rise to liability. See Lyon, 678 N.E. 2d at 1310 ("a general right to order the work stopped such as existed here is not considered sufficient control to impose liability for a contractor's negligence"); Foley v. Rust Intern., 901 F.2d 183, 184-85 (1st Cir. 1990).

### b. Landowner Liability

Plaintiffs further allege that BECO negligently failed to warn Oliver of known dangerous conditions on its premises. BECO counters that it cannot be liable for a hazard known to, and created by, its independent contractors.

Under Massachusetts law, a landowner owes a duty of reasonable care to the employees of its independent contractors. Diodato v. United States, 972 F.2d 337 (1st Cir. 1992) (citing Poirier v. Town of Plymouth, 372 N.E.2d 212, 227 (Mass. 1978). However, courts also recognize a distinction between a pre-existing hazard and a dangerous condition created by the very work the independent contractor was hired to perform. See Bayliss v. Hannan Construction Corp., 22 Mass. L. Rptr. 188, 2007 WL 738925, at *5 (Mass. Super. Feb. 14 2007) (citing Farren v. General Motors Corp., 708 F. Supp. 436, 445 (D. Mass. 1989)). As to the former, landowners retain the obligation to maintain the premises in a reasonably safe condition and to warn of dangers of which it was or should have been aware. Farren, 708 F. Supp. At 443. As to the latter, however,

> there are instances of hazardous employment where an independent contractor is engaged to do a particular task which presents inherent risk to the employees of that contractor. To some extent the [law] was developed to reflect an allocation of risk as between the employer (property owner) and the employee (independent contractor's employee) who accepts such employment. We do not here seek to preclude the continuation of such a proper allocation of risk between the parties nor to make the property owner an insurer against all loss.

Poirier, 372 N.E. 2d at 227. Other jurisdictions have similarly embraced the view that a landowner's duty to employees of independent contractors does not extend to situations where the independent contractor's work creates the dangerous condition. Farren, 708 F. Supp. at 444-45 (citing cases, and indicating that duty arises only when landowner is both aware of risk and contributes to it).

This limitation on landowner liability stems accords with § 343A of the Restatement. Subsection (1) provides:

> A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

"This exception extends to situations where the independent contractor and the landowner are equally knowledgeable of the dangerous conditions, or where the defective conditions are created by the work of the independent contractor or his employees." Hood v. Hess Oil Virgin Islands Corp., 650 F. Supp. 678, 682 (D.V.I. 1986) (citation omitted). See also Seeney v. Dover Country Club Apartments, Inc., 318 A.2d 619, 623 (Del. Super. Ct. 1974) (same, citing "the well-settled rule that a possessor of land owes no duty to an employee of an independent contractor with respect to dangerous conditions which are known to the contractor.").

Because it is undisputed that GE and Bechtel entered the Pilgrim premises with at least as much knowledge of the presence of asbestos as BECO, BECO had no duty to warn them of an unknown hazard. NSTAR's Motion for Summary Judgment is therefore ALLOWED as to Counts VIII, IX, X, and XI. See Jupin v. Kask, 849 N.E.2d 829, 835 (Mass. 2006) ("the existence of a duty is a question of law, and is thus an appropriate subject of summary judgment.").

## IV. Conclusion

GE's Motion for Summary Judgment (Docket # 307) is DENIED as to Counts I, II, IX, and X, and ALLOWED as to Counts III, IV, and XI; its Motion to Dismiss Count XI (Docket # 283) is DENIED AS MOOT. NSTAR's Motion for Summary Judgment (Docket # 314) is ALLOWED on all counts.

|  March 30, 2018  | /s/Rya W. Zobel |
|---|---|
| DATE | RYA W. ZOBEL<br>SENIOR UNITED STATES DISTRICT JUDGE |